IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JEFFREY GRODKO,<br>　　　　　Plaintiff,<br><br>　　　v.<br><br>CENTRAL EUROPEAN DISTRIBUTION<br>CORPORATION, et al.,<br>　　　　　Defendants. | Civil Action<br>No. 12-5530 (JBS-KMW) |
| PUERTO RICO SYSTEM OF<br>ANNUITIES AND PENSIONS FOR<br>TEACHERS,<br>　　　　　Plaintiff,<br><br>　　　v.<br><br>CENTRAL EUROPEAN DISTRIBUTION<br>CORPORATION, et al.,<br>　　　　　Defendants. | Civil Action<br>No. 12-5531 (JBS-KMW) |

**OPINION**

APPEARANCES:

Tina Moukoulis, Esq.
Deborah Gross, Esq.
Law Office of Bernard M. Gross, PC
John Wanamaker Building
Suite 450
Juniper and Market Streets
Philadelphia, PA 19107
　　　Attorney for Plaintiffs Medvezhonok Holdings Limited,
　　　Lancrenan Investments Limited, Roselia Limited, and the
　　　Prosperity Subsidiary Group

Tina Moukoulis, Esq.
　　　-and-
David Avi Rosenfeld, Esq.
Robbins Geller Rudman & Dowd LLP
58 South Service Road
Suite 200
Melville, NY 11747
　　　Attorneys for Plaintiff Protsvetaniye Holdings Limited

```
Bruce Daniel Greenberg, Esq.
Jeffrey Alan Shooman, Esq.
Lite Depalma Greenberg, LLC
Two Gateway Center
12th Floor
Newark, NJ 07102
     Attorneys for Plaintiff Harry Nelis and Plaintiff Jeffrey
     Grodko

Jeremy Alan Lieberman, Esq.
Patrick Dahlstrom, Esq.
Pomerantz Grossman Hufford Dahlstrom & Gross LLP
600 Third Avenue, 20th Florr
New York, New York 10016
     Attorney for Plaintiff Harry Nelis

Peter S. Pearlman, Esq.
Cohn, Lifland, Pearlman, Herrmann, & Knopf, LLP
Park 80 West Plaza One
250 Pehle Ave., Suite 401
Saddle Brook, NJ 07663
     -and-
Samuel H. Rudman, Esq.
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY 11747
     Attorneys for Plaintiff Puerto Rico System of Annuities and
     Pensions for Teachers

Diane P. Sullivan, Esq.
Weil Gotshal & Manges LLP
301 Garnegie Center
Suite 303
Princeton, NJ 08540
     -and-
Kenneth J. Cesta, Esq.
Hoagland, Longo, Moran, Dunst & Doukas, LLP
40 Paterson St.
New Brunswick, NJ 08901
     -and-
Robert J. Del Tufo, Esq.
Robert Fumerton, Esq.
Patrick Rideout, Esq.
Skadden, Arps, Slate, Meagher & Flom, LLP
Four Times Square
New York, NY 10036
     Attorneys for Defendant Central European Distribution
     Corporation
```

Diane P. Sullivan, Esq.
     -and-
Jamie L. Hoxie, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
     Attorneys for Defendants William V. Carey and Christopher
     Biedermann

**SIMANDLE,** Chief Judge:

## I.    INTRODUCTION

This consolidated action involves two federal securities
class actions brought by Central European Distribution
Corporation ("CEDC") shareholders under §§ 10(b) and 20(a) of the
Securities Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule
10b-5 promulgated thereunder. It comes before the Court on Harry
E. Nelis' motion for appointment as lead plaintiff and approval
as lead counsel [Docket Item 20][1], the Prosperity Subsidiary
Group's motion for appointment as lead plaintiff and approval of
lead counsel selection [Docket Item 22], and the request of named
Plaintiff Puerto Rico System of Annuities and Pensions for
Teachers to be considered as lead plaintiff if the Court does not
select the Prosperity Subsidiary Group [Docket Item 32]. For the
reasons explained herein, the Court will appoint Puerto Rico as
lead plaintiff.

---

[1] All docket item references are to Civil Action No. 12-5530,
unless otherwise noted.

## II. PROCEDURAL HISTORY

On June 8, 2012, Plaintiff Jeffrey Grodko commenced Civ. No. 12-4512 in the Southern District of New York ("Grodko action") by filing a complaint against the Central European Distribution Corporation ("CEDC"), Christopher Biedermann, and William Carey.[2] On August 7, 2012, Plaintiff Puerto Rico System of Annuities and Pensions for Teachers ("Puerto Rico") commenced Civ. No. 12-6046 in the Southern District of New York ("Puerto Rico action") by filing a complaint against Defendants CEDC, Biedermann, and Carey.

On September 5, 2012 the Grodko action was transferred to the District of New Jersey, becoming Civil Action No. 12-5530 in this District. The Puerto Rico action was also transferred into this District, becoming Civ. No. 12-5531. Once the Grodko and Puerto Rico actions arrived in the District of New Jersey, they were automatically consolidated with In re Central European Distribution Corp. Securities Litigation ("CEDC I"), Civ. No. 11-6247, another Securities and Exchange Act case in which CEDC

---

[2] Defendant Carey was CEDC's Chairman, Chief Executive Officer, and President. Defendant Biedermann was CEDC's Vice President and Chief Financial Officer.

shareholders sued the same Defendants.[3] The automatic consolidation occurred pursuant to the Court's August 22, 2012 Order in CEDC I, mandating that each new case that arises out of the subject matter of CEDC I and that is filed in or transferred to this Court shall be consolidated with CEDC I, subject to the right of new parties to move to de-consolidate.

Plaintiff Jeffrey Grodko and lead plaintiff movant Harry Nelis filed a Motion for Relief [Civ. No. 11-6247, Docket Item 72] from the Court's August 22, 2012 Order, arguing that the Grodko action and CEDC I were factually distinct and consolidation was unwarranted. Plaintiff Puerto Rico also filed an Objection to the August 22, 2012 Opinion and Order [Civ. No. 11-6247, Docket Item 77], objecting to the Court's lead plaintiff appointment in CEDC I. On November 8, 2012, the Court issued an opinion and order ("November 8, 2012 Order") [Docket Item 49] granting Grodko and Nelis' request to de-consolidate the Grodko action from CEDC I. In the November 8, 2012 Order, the Court also ordered that the Puerto Rico and Grodko actions should be consolidated with each other because they are substantially identical. The two actions were consolidated onto the first-filed

_____

[3] In re Central European Distribution Corp. Securities Litigation was originally called Steamfitters Local 449 Pension Fund v. Central European Distribution Corporation, Civ. No. 11-6247 (JBS).

5

docket, Civ. No. 12-5530, and the Court shall refer to them as "CEDC II." Because the Puerto Rico action was separated from CEDC I, the Court dismissed Puerto Rico's objection to the CEDC I lead plaintiff appointment as moot.

The Court granted the Grodko and Nelis de-consolidation request because CEDC I and CEDC II are factually distinct. CEDC I involves shareholders who purchased CEDC common stock between August 5, 2010 and February 28, 2011 ("CEDC I class period"). The action alleges that Defendants made materially false and misleading statements regarding CEDC's vodka business. (Civ. No. 11-6247, Compl. ¶ 16.) Defendants allegedly failed to disclose double digit declines in CEDC's vodka portfolio, growing loss of vodka market share, adverse effects from a new vodka product launch, and an excise tax issue impacting vodka production in Russia. (Id. ¶¶ 24, 29, 31.) These problems culminated in March of 2011 when CEDC took a $131 million non-cash impairment charge because the value of Polish vodka brand trademarks had deteriorated. (Id. ¶ 32.)

Unlike CEDC I, the present consolidated matter in CEDC II involves shareholders who purchased any CEDC securities, not only CEDC common stock, between March 1, 2010 and June 4, 2012. (Civ. No. 12-5530, Compl. ¶ 1.) CEDC II involves CEDC's failure to account for retroactive trade rebates provided to customers of

6

its main operating subsidiary in Russia, causing a $30-40 million reduction in CEDC's previously-reported consolidated net sales, operating profit, and accounts receivable. (Id. ¶ 3.) Because of these differences, the court de-consolidated CEDC I and CEDC II, but the Court ordered that the two actions would be coordinated for discovery and case management purposes. (November 8, 2012 Order at 2.)

## III. LEAD PLAINTIFF APPLICATION HISTORY

The law firm that filed the Grodko Complaint, Pomerantz Haudek Grossman & Gross, issued a notice on June 8, 2012, announcing that it had filed a lawsuit on behalf of CEDC shareholders who purchased CEDC securities between March 1, 2010 and June 4, 2012. The notice announced that the deadline to request appointment as lead plaintiff was August 7, 2012.[4]

On August 7, 2012, Harry E. Nelis filed a motion for appointment as lead plaintiff [Docket Item 20], as did the Prosperity Subsidiary Group [Docket Item 22]. Puerto Rico filed a response [Docket Item 32] to both motions indicating its interest in being appointed lead plaintiff if the Prosperity Subsidiary

---

[4] The Private Securities Litigation Reform Act ("PSLRA") mandates that lead plaintiff applicants must move the Court for appointment within 60 days after publication of the notice announcing the action. 15 U.S.C. § 78u-4(a)(3)(A)(i)(II).

Group were not chosen. The Prosperity Subsidiary Group filed opposition [Docket Item 33] to Nelis' motion; and Nelis filed opposition [Docket Item 34] to the Prosperity Subsidiary Group's motion. Nelis filed a reply [Docket Item 46] and so did the Prosperity Subsidiary Group [Docket Item 52]. Essentially, there are three lead plaintiff candidates before the Court: Harry Nelis, the Prosperity Subsidiary Group, and Puerto Rico.

## IV. LEAD PLAINTIFF APPOINTMENT PROCESS

The Private Securities Litigation Reform Act ("PSLRA") outlines a process for selecting a lead plaintiff with the goal of finding a lead plaintiff who can vigorously prosecute the class' interests. See e.g. In re Cendant Corp. Sec. Litig., 404 F.3d 173, 192 (3d Cir. 2005) ("[T]he PSLRA strives to ensure that the lead plaintiff will have both the incentive and the capability to supervise its counsel in the best interests of the class"). Appointing a lead plaintiff involves a two-step process: "the court first identifies the presumptive lead plaintiff, and then determines whether any member of the putative class has rebutted the presumption." In re Cendant Corp. Litig., 264 F.3d 201, 262 (3d Cir. 2001).

The Court must adopt a presumption that the most adequate plaintiff "is the person or group . . . that . . . has the

largest financial interest in the relief sought by the class; and . . . otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii). For purposes of identifying the presumptive lead plaintiff, the Court must determine whether the movant with the largest financial interest has made a *"prima facie* showing of typicality and adequacy." In re Cendant Corp. Litig. at 263. If the movant with the largest financial interest makes that *prima facie* showing, it will be the presumptive lead plaintiff.

Once a presumptive lead plaintiff is identified, the Court then determines whether the presumption has been rebutted. The presumption may be rebutted upon proof that the presumptively most adequate plaintiff is "subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(bb).

The Third Circuit has recognized "the challenge presented by a defense unique to a class representative--the representative's interests might not be aligned with those of the class, and the representative might devote time and effort to the defense at the expense of issues that are common and controlling for the class." Beck v. Maximus, Inc., 457 F.3d 291, 297 (3d Cir. 2006). "A proposed class representative is neither typical nor adequate if the representative is subject to a unique defense that is likely

9

to become a major focus of the litigation." Id. at 301.

There is no requirement at this early stage to "prove a defense, only to show a degree of likelihood that a unique defense might play a significant role at trial." Steamfitters Local 449 Pension Fund v. Cent. European Distribution Corp., CIV.A. 11-6247 (JBS), 2012 WL 3638629, *9 (D.N.J. Aug. 22, 2012). The point "is not to adjudicate the case before it has even begun, but rather to protect the absent class members from the expense of litigating defenses applicable to lead plaintiffs but not to the class as a whole." Id. at *9 (quoting In re Netflix, Inc., Sec. Litig., 2012 U.S. Dist. LEXIS 59465 (N.D. Cal. Apr. 26, 2012)). If the presumptive lead plaintiff is subject to unique defenses that are likely to become a significant focus at litigation, then the presumption is rebutted and the Court must identify another lead plaintiff by, once again, beginning with the remaining applicant with the greatest financial losses.

The PSLRA directs courts to identify the applicants with the greatest financial interest in the relief sought because Congress sought to encourage courts to choose institutional investors as lead plaintiffs: "Both the Conference Committee Report and the Senate Report state that the purpose of the legislation was to encourage institutional investors to serve as lead plaintiff, predicting that their involvement would significantly benefit

10

absent class members." <u>In re Cendant Corp. Litig.</u> at 273.

**V. LEAD PLAINTIFF CANDIDATES**

We first examine each candidate's alleged financial interest. As discussed below, the Prosperity Subsidiary Group alleges the greatest losses, <u>i.e.</u>, $12.9 million, but it is subject to unique defenses regarding causation, and the Court will deny its motion for lead plaintiff appointment, for reasons explained below. The next applicant, Puerto Rico, allegedly lost $1,406,395. Puerto Rico is an adequate and typical lead plaintiff, and it is not subject to unique defenses. The Court will appoint Puerto Rico and, as per the PSLRA's mandatory process, will not consider Harry Nelis, who allegedly lost the lesser sum of $106,451.

**a. The Prosperity Subsidiary Group**

The Prosperity Subsidiary Group submitted a timely motion for appointment as lead plaintiff and approval of its selection of Robbins Geller Rudman & Dowd as lead counsel. The Prosperity Subsidiary Group consists of four entities: Protsvetaniye Holdings Limited, Medvezhonok Holdings Limited, Lancrenan Investments Limited, and Roselia Limited (collectively, the "Subsidiaries"). The Subsidiaries allegedly lost over $12.9

11

million in their CEDC securities transactions. (Subsidiaries'
lead pl. br. at 4.) The Subsidiaries argued that they suffered
the greatest losses and satisfied the typicality and adequacy
requirements.

Nelis opposed [Docket Item 34] the Subsidiaries'
appointment.[5] He argued that the Subsidiaries sold their CEDC
shares long before the alleged disclosures that are at the heart
of CEDC II and, therefore, could not allege loss causation under
Section 10 of the Securities Exchange Act of 1934. (Nelis Opp'n
at 1.) Essentially, he argued that the Subsidiaries did not sell
their shares in response to the disclosures detailed in the
Complaint and, therefore, they cannot allege that the misconduct
and subsequent disclosures described in the CEDC II Complaint
caused their losses. He argued that, absent cognizable losses,
the Subsidiaries lacked standing to assert the Complaint's claims
and that the loss causation issues would subject the Subsidiaries
to unique defenses that would severely prejudice the class.[6]

_____

[5] Puerto Rico did not oppose the Subsidiaries' appointment.
Puerto Rico recognized that the Subsidiaries had the largest
financial interest and requested appointment only if the Court
did not appoint the Prosperity Group. (Puerto Rico Response at
2.)

[6] Nelis also argued that the Subsidiaries lacked authority to sue
because they had delegated authority to their investment advisor.
Because the loss causation analysis yields a conclusive answer
regarding the Subsidiaries' lead plaintiff application, the Court
need not analyze the Subsidiaries' authority to sue.

The PSLRA mandates that "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). In other words, "[a] private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss." Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 338 (2005).

In this case, the causation question is complicated because there are two separate actions, CEDC I and CEDC II, which involve different misconduct, as discussed above. There is no doubt that the Subsidiaries have alleged that they suffered losses due to Defendants' misconduct; the issue is whether the misconduct and disclosures in CEDC II caused their losses.

All of the Subsidiaries sold their CEDC shares over one year before the CEDC II class period ended. The CEDC class period is March 1, 2010 to June 4, 2012. Essentially, the Subsidiaries sold all of their CEDC shares by May 26, 2011 at the latest,[7] and

_____

[7] Protsvetaniye Holdings Limited sold all of its shares on May 11 and 13, 2011. (Protsvetaniye Holdings Limited Certification, Schedule A.) Medvezhonok Holdings Limited sold all of its shares on May 11, 13, 16, 17, 19, and 20, 2011. (Medvezhonok Holdings Limited Certification, Schedule A.) Lancrenan Investments Limited sold all of its shares on May 26, 2011. (Lancrenan Investments Limited Certification, Schedule A.) Roselia Limited sold all of its shares on May 11 and 13, 2011. (Roselia Limited Certification, Schedule A.)

their alleged losses arose from the vodka portfolio.

The Grodko Complaint [Docket Item 1] describes a series of later disclosures in which "the truth beg[an] to emerge" regarding the retroactive trade rebates, which were provided to customers of CEDC's main operating subsidiary in Russia and which form the heart of this action. (Compl. ¶¶ 39-45.) The first disclosure was on February 29, 2012 and caused the stock price to drop 19.5%. (Compl. ¶¶ 39-40.) The second disclosure was on May 10, 2012 and caused CEDC securities to drop 4.5%. (Compl. ¶¶ 41-42.) The final disclosure was on June 4, 2012 and caused the stock price to drop 10.7%. (Compl. ¶¶ 43, 45.) In other words, the first disclosure in February of 2012, pertaining to the retroactive trade rebates at issue herein, occurred nine months after the Subsidiaries sold their shares.

The Court must not appoint a lead plaintiff that is subject to unique defenses that will prejudice the class. The Subsidiaries sold all their stock between nine and 12.5 months before the disclosures emphasized in the Grodko Complaint. A lead plaintiff whose losses do not relate, either temporally or topically, to the alleged wrongdoing will be subject to unique defenses regarding loss causation.[8]

--------------------------------------------------

[8] It is also possible to construe the Subsidiaries' loss causation issue as a typicality problem, instead of a unique

The Subsidiaries sought lead plaintiff appointment in CEDC I, but the Court denied their application, even though they had the greatest financial losses, because they were subject to unique defenses. In CEDC I, the Subsidiaries were part of a larger group, the Prosperity Group, which included five other entities that never owned CEDC securities and thus lacked standing. The Prosperity Group submitted a flawed lead plaintiff application in CEDC I that did not account for recent legal developments that prohibit investment advisors and other entities that have not suffered losses from prosecuting securities

_____

defense problem. Typicality of claims exists if "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendants' liability, even if some minor variations exist in the factual allegations asserted by different class members." Constance Sczesny Trust v. KPMG LLP, 223 F.R.D. 319, 324 (S.D.N.Y. 2004). The issue is whether the Subsidiaries' claims arise "from the same course of events," i.e. the alleged misconduct at the heart of CEDC II, not CEDC I. The Court has conducted a unique defense analysis, instead of a typicality analysis, because it seemed simplest to consider whether the Subsidiaries were subject to a unique defense, instead of determining, at this early stage, a precise timeline of events regarding misconduct at CEDC. Moreover, it is highly doubtful that the Subsidiaries could satisfy the typicality prong for class representative status, since the Subsidiaries have alleged that their losses arose from the vodka-related impairment charge machinations that were disclosed in March, 2011, as alleged in CEDC I, rather than from the retroactive trade rebates and related issues that were disclosed 9-12 months after the Subsidiaries had already divested. A party unlikely to qualify as a class representative should not ordinarily be considered as a Lead Plaintiff in a class action.

litigation.[9] The Subsidiaries could have been lead plaintiff in CEDC I because they allegedly suffered the greatest financial losses in the CEDC I class period, but the Prosperity Group's application was flawed. The Subsidiaries now seek appointment in this action. They have remedied the flaws that existed in their CEDC I lead plaintiff application because the investment advisor and managed funds that never owned CEDC securities are not part of their group. But they are now subject to unique defenses regarding causation because CEDC I and CEDC II are factually distinct.

The Subsidiaries argue that they sold their shares after a partial disclosure and, therefore, they can establish loss causation. On March 1, 2011, CEDC disclosed that its year ending results were a net loss of $104.7 million compared to net income of $78.3 million for the same period the year before. This

_____

[9] A 2008 Supreme Court case, Sprint Communications Co., L.P. v. APCC Servs., Inc., 554 U.S. 269 (2008), held that assignees have standing because they have legal title to the injury-in-fact. The Second Circuit then interpreted that case in W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100 (2d Cir. 2008), to indicate that an investment advisor without title to claims lacks standing because he lacks legal ownership and therefore has not suffered an injury-in-fact. The Prosperity Group's application included the investment advisor and four managed investment funds, none of whom owned any CEDC securities. In addition, the investment advisor was the only entity that submitted the certification mandated by the PSLRA. Steamfitters Local at *9-*13. The Steamfitters Local opinion explains other, additional reasons for the Court's decision.

partial disclosure caused the stock to fall 37%. (Subsidiaries' Opposition at 4-5.) The Subsidiaries argue that "this partial disclosure was the beginning of defendants' attempts to walk the price of the stock down" before the final disclosure on June 4, 2012. (Subsidiaries' Opposition at 5.) The Subsidiaries argue that they need not show causation from every disclosure because loss causation can be established by selling shares after a partial disclosure.

The Subsidiaries' argument lacks merit. First, the CEDC I complaint, which the Subsidiaries' counsel filed on behalf a different client, also references the March 1, 2011 disclosure of losses and notes that "[t]he loss was due in part to an impairment charge." (Civ. No. 11-6247, Compl. ¶ 30.) The CEDC I complaint then describes a conference call in March of 2011 in which CEDC disclosed double digit declines in its vodka portfolio combined with the negative implications of a new vodka product launch; these problems "resulted in a $131 million non-cash impairment charge. . . ." (Civ. No. 11-6247, Compl. ¶ 32.) At this time, the Court is not conducting a fact-finding inquiry into the causes and veracity of CEDC's financial reports; the Court simply notes that, in the CEDC I complaint, the Subsidiaries' counsel explained that the March 2011 share losses were due, in part, to an impairment charge. CEDC I is about

17

impairment charges. Unlike CEDC I, CEDC II involves CEDC's failure to account for retroactive trade rebates provided to customers of its main operating subsidiary in Russia, causing a $30-40 million reduction in CEDC's previously-reported consolidated net sales, operating profit, and accounts receivable. The complaints do not contain any allegations that the share price drop in May 2011 reflected misconduct relating the CEDC's handling of the retroactive trade rebates. Based on the Court's reading of the various complaints filed in the matters that became CEDC I and CEDC II, it appears that the March 2011 disclosure is related to the impairment charge that forms the heart of the CEDC I action, not the Russian trade rebates at the heart of this action. Essentially, it seems that the Subsidiaries' losses stem from misconduct that is at the heart of CEDC I, not the present action.

In addition, the Subsidiaries alleged the exact same losses in both CEDC I and CEDC II, even though the Subsidiaries have acknowledged that CEDC II is a "separate and distinct action" from CEDC I. (Subsidiaries' Reply at 5.) It seems implausible to the Court that two "separate and distinct" actions could cause the same losses, particularly when, as here, the Subsidiaries had sold all of their securities more than 12 months before the CEDC II class period closed.

18

The Subsidiaries cite several cases in support of their argument that sales after a partial disclosure do not subject a lead plaintiff applicant to unique defenses, but none of these cases support its lead plaintiff application. In the first case, Juliar v. SunOpta Inc., 08 CIV. 933 (PAC), 2009 WL 1955237 (S.D.N.Y. Jan. 30, 2009), the district court held that, "where a putative lead plaintiff sold all its shares after a partial disclosure of misconduct, . . . that putative lead plaintiff does not face the unique defense of having to show loss causation to the extent that it cannot serve as lead plaintiff." Id. at *2. The SunOpta court chose between two lead plaintiff applicants: one was a group of three individual investors and the other was a pairing of two pension funds. The individual investors argued that, even though the Pension Funds had the largest financial interest, they were inadequate lead plaintiffs because one of the funds, the Western Washington Laborers-Employers Pension Trust ("WWLE"), sold its shares before SunOpta's January 24, 2008 disclosure that it was restating its financial position. WWLE sold its shares on January 17, January 23, and January 24, 2008. Its January 24 sales occurred before SunOpta's restatement announcement. The pension funds argued that there was substantial leakage of SunOpta's misconduct prior to the January 24, 2008 disclosure because SunOpta's director announced his resignation

19

in December of 2007, trading volume increased substantially in
the week prior to the January 24 disclosure, and an analyst
released a report on January 22 that adversely rated SunOpta.

SunOpta does not support the Subsidiaries' lead plaintiff
candidacy. First, WWLE, the putative lead plaintiff applicant in
SunOpta, sold its shares in the week before SunOpta's disclosure,
and ample evidence emerged that week regarding SunOpta's fiscal
condition. The sales were, at most, seven days before the
corrective disclosure. In the present case, the latest Subsidiary
sale occurred nine months before the earliest disclosure at issue
and 12.5 months before the final disclosure on June 4, 2012, the
last day of the class period. Further, the present complaint does
not allege that the market gained knowledge of CEDC's alleged
misconduct a year or more before the 2012 disclosures at the
heart of CEDC II.

In addition, the SunOpta court also noted that the PSLRA is
intended to encourage institutional investors as lead plaintiffs
and, if the pension funds did not serve, then the court would
have to choose individual investors. In this case, there is
another institutional investor, i.e., Puerto Rico, whom the Court
can consider. In addition, the SunOpta court emphasized that,
even if WWLE's losses were removed from the pension funds' loss
calculation, the remaining pension fund's losses were only

20

$30,000 less than the individuals' losses. The remaining lead plaintiff had not sold its shares before SunOpta's corrective disclosure. In this case, all the Subsidiaries sold their shares by the end of May 2011; their group does not include any entities that retained their shares for the corrective disclosures that occurred in 2012 and which resulted in further losses in share values.

The Subsidiaries also cited Weiss v. Friedman, Billings, Ramsey Group, Inc., 05-CV-04617 (RJH), 2006 WL 197036 (S.D.N.Y. Jan. 25, 2006) to support their argument that sales after partial disclosures can establish loss causation. The Weiss court noted that three out of the seven lead plaintiff applicants sold all their shares before the class period ended, thus making the loss causation defense applicable to multiple applicants. In this case, the Subsidiaries are the only lead plaintiff applicant that sold all of its shares before the class period ended.

The Subsidiaries also cited Montoya v. Mamma.com Inc., 05 CIV. 2313 (HB), 2005 WL 1278097 (S.D.N.Y. May 31, 2005), in which the district court held that "loss causation does not require *full* disclosure and can be established by *partial* disclosure during the class period which causes the price of shares to decline." Id. at *2 (emphasis in original). But the Mamma.com court found that the lead plaintiff applicant "purchased a

substantial portion of their securities before the April 6, 2004 disclosure . . ., sold a substantial portion of their shares after the April 6, 2004 disclosure . . . and therefore can allege that the subject of the fraudulent statement or omissions was the cause of the actual loss suffered." Id. at *2. This case undermines the Subsidiaries' argument because Mamma.com states that sales after a disclosure enable a lead plaintiff applicant to "allege that the subject of the fraudulent statement or omissions was the cause of the actual loss suffered." In this case, there is no question that the Subsidiaries can allege loss causation relating to the March 2011 disclosure; the issue is whether the Subsidiaries can represent the losses that the class suffered after the disclosures in 2012, i.e., the losses that appear, at this point, integral to CEDC II. Unlike the Mamma.com lead plaintiff, the Subsidiaries did not sell any shares after the 2012 disclosures because all their sales occurred by May 26, 2011. They are, therefore, subject to a unique defense regarding whether they can show loss causation relating to the losses that CEDC shareholders incurred in 2012.

The Third Circuit has held that "[a] proposed class representative is neither typical nor adequate if the representative is subject to a unique defense that is likely to become a major focus of the litigation." Beck at 301. The

Subsidiaries are subject to a unique defense regarding whether they can establish loss causation from the events that form the core of this action. The Subsidiaries' motion for lead plaintiff appointment will be denied because the Court cannot prejudice the class with the time and expense that will probably ensue from litigating the unique loss causation defense to which only the Subsidiaries are subject.

### b. Puerto Rico

Puerto Rico suffered $1,406,395 in losses, and it is an institutional investor, i.e., the type of investor whom Congress encouraged to serve as lead plaintiff by enacting the PSLRA.

Nelis argues that Puerto Rico cannot be lead plaintiff because it did not submit a timely application. But Puerto Rico filed a complaint before the lead plaintiff application deadline expired. The PSLRA directs courts to consider lead plaintiff applicants and plaintiffs who filed complaints: "the court shall adopt a presumption that the most adequate plaintiff . . . is the person or group of persons that has either filed the complaint or made a motion. . . ." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(aa). In cases like this one, "where numerous complaints have been consolidated, the filing of any of the initially consolidated actions will suffice" to meet the PSLRA's requirement "that the

movant file a complaint or timely move for appointment as lead
plaintiff." In re Initial Pub. Offering Sec. Litig., 214 F.R.D.
117, 120 (S.D.N.Y. 2002). It is, therefore, clear that filing a
complaint entitles a lead plaintiff candidate to consideration
under the clear wording of subparagraph 78u-
4(a)(3)(B)(iii)(I)(aa), above.

     Nelis argues that considering lead plaintiff candidates who
only filed complaints and did not submit a lead plaintiff
application will "wreak havoc on the lead plaintiff appointment
process" because plaintiffs could file complaints at any time,
even months after the Court has appointed a lead plaintiff.
(Nelis Reply at 15.) The Court need not decide how it would
handle the hypothetical problem of plaintiffs filing complaints
after a lead plaintiff decision because that issue is not before
the Court. In addition, the Court notes that the In re Initial
Pub. Offering Sec. Litig. language limits consideration to "any
of the initially consolidated actions."

     Nelis also argues that In re Initial Pub. Offering Sec.
Litig. is inapplicable because "Judge Scheindlin only considered
a plaintiff that merely filed a complaint as a potential lead
plaintiff after determining that there were no other eligible
candidates that had filed a timely motion." (Nelis Reply at 15.)
Because Judge Scheindlin was substituting a lead plaintiff, she

had to consider candidates that moved for appointment within 60 days of the previous lead plaintiff's withdrawal, a decision that the PSLRA does not explicitly discuss. But she noted that considering applicants who filed a complaint in the consolidated actions was "explicitly contemplated by the PSLRA." In re Initial Pub. Offering Sec. Litig. at 120.

Puerto Rico has filed a complaint in this consolidated action and, therefore, it is entitled to consideration. It has allegedly suffered the greatest losses of the remaining applicants, its losses arose from the conduct at issue in the class period constituting the heart of CEDC II, and it is an institutional investor, which Congress has encouraged courts to appoint. The Court will therefore select Puerto Rico as lead plaintiff.

Nelis also argues that Puerto Rico's counsel, Robbins Geller, has engaged in unethical gamesmanship and forum shopping because (1) it represents both Puerto Rico and the Subsidiaries; (2) between CEDC I and CEDC II, it has sought appointment of six different lead plaintiff groupings; and (3) it has sought appointment on behalf of its clients in both this District and the Southern District of New York.

Nelis has not cited any legal authority supporting his contention that counsel in a securities class action are

necessarily behaving unethically when they represent multiple plaintiffs. The Court notes that Nelis' counsel also represents Jeffrey Grodko, who filed the initial complaint in this action. Nor has Nelis identified any specific conflict of interest between Robbins Geller's representation of the Subsidiaries and Puerto Rico. Puerto Rico acknowledged that the Subsidiaries had the greatest losses and only requested consideration as lead plaintiff in the event that the Court does not select the Subsidiaries. (Puerto Rico Response at 2.) In addition, Nelis' counsel, not Puerto Rico's counsel, filed the first complaint in the Southern District of New York. The various complaints filed in the two districts created confusing complications but, given that all the actions are now before this Court and Robbins Geller has not tried to change the forum, the Court does not perceive any unethical forum-shopping.

Moreover, the Court notes that, even if there were problems with Puerto Rico's choice of counsel, that choice would not invalidate Puerto Rico's lead plaintiff application. The PSLRA directs the court to select a lead plaintiff and, once that appointment is clear, "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v). Even assuming, arguendo, that problems existed with Puerto Rico's

26

choice of counsel, the appropriate remedy would be to direct Puerto Rico to choose other counsel, not to invalidate Puerto Rico's lead plaintiff candidacy. The Ninth Circuit has explained that choice of counsel should rarely invalidate a lead plaintiff application: "Even if a presumptive lead plaintiff has selected counsel the court believes cannot adequately represent the class, this can only serve as a basis for finding the plaintiff is inadequate if the poor choice of counsel reflects some broader deficiency . . . that makes him incapable of representing the class." In re Cavanaugh, 306 F.3d 726, 733 n.12 (9th Cir. 2002). Before disqualifying a presumptive lead plaintiff based on his choice of counsel, the Ninth Circuit explained that the district court "should, at the very least, advise the plaintiff about its doubts and ask him whether he would be willing to serve as lead, even if the court were to disapprove his choice of counsel and he were forced to seek the services of another attorney." Id. at 733 n.12.

Puerto Rico's choice of counsel does not, in any way, indicate that Puerto Rico is incapable of representing the class. Robbins Geller has extensive experience with complex securities litigation and a successful track record. Puerto Rico's selection of Robbins Geller Rudman & Dowd as lead counsel and Cohn, Lifland, Pearlman, Herrmann & Knopf as local counsel will be

27

approved.

### c. Harry Nelis

Puerto Rico will be lead plaintiff. As per the PSLRA's mandatory lead plaintiff selection procedure, the Court will not consider the merits of Nelis' lead plaintiff application because the Court must choose the applicant with the greatest financial losses that, <u>inter alia</u>, is not subject to unique defenses. Harry Nelis allegedly lost $53,630 under the Last-In-First-Out methodology of calculating losses and $106,451 under the First-In-First-Out methodology. Regardless of the calculation method, Puerto Rico's losses dwarf Harry Nelis' losses. Nelis will not be lead plaintiff.

## VI. CONCLUSION

The Court will deny the Subsidiaries' lead plaintiff application because they are subject to unique defenses regarding loss causation. The Court will appoint Puerto Rico as lead plaintiff because, after the Subsidiaries, it has allegedly suffered the greatest financial losses and is not subject to unique defenses. Harry Nelis' lead plaintiff motion will be denied because Puerto Rico suffered substantially greater losses. Puerto Rico's selection of Robbins Geller Rudman & Dowd as lead

counsel and Cohn, Lifland, Pearlman, Herrmann & Knopf as local

counsel will be approved.

The accompanying order shall be entered.


**December 17, 2012**                    **s/ Jerome B. Simandle**
Date                                     JEROME B. SIMANDLE
                                         Chief U.S. District Judge